DocuSign Envelope ID: 7458F873-5C4C-4B87-9A40-0476217C882

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### (Harrisonburg Division)

| | |
|---|---|
| **TATIANA LISA COMPTON** | * |
|   **(a/k/a Tatiana Lisa Armstrong)** | |
| **19 Mill Gardens** | * |
| **Tring** | |
| **Hertfordshire** | * |
| **HP23 5ES** | |
| **England** | * |
| **United Kingdom** | |
| | * |
| **Petitioner,** | |
| | *   **Civil No.:**  5:24-cv-00004 |
| **v.** | |
| | * |
| **SCOTT COMPTON** | |
| **53 Gooney Manor Loop** | * |
| **Browntown, Virginia 22610** | |
| | * |
| **Respondent.** | |
| | * |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### VERIFIED PETITION FOR RETURN OF THE CHILDREN TO ENGLAND
### AND REQUEST FOR ISSUANCE OF SHOW CAUSE ORDER

**The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980; International Child Abduction Remedies Act, 22 U.S.C. 9001 *et seq*.**

## I.     INTRODUCTION

1.     This Petition is filed as a result of the wrongful retention in the United States of the parties' two children, A-LC (female; born in 2014) and MKC (female; born in 2017) (the "children"), from their habitual residence. The wrongful retention occurred on or about January 4, 2024.

2.      The Petitioner, Tatiana Lisa Compton (the "Mother"), is the children's mother. The Mother is a British citizen and an American citizen.

3.      The Respondent, Scott Compton (the "Father") is the children's father. The Father is an American citizen.

4.      Both children were born in England and are dual British and American citizens.

5.      This Petition is brought pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980[1] (hereinafter the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act[2] (hereinafter "ICARA").

6.      The Convention came into effect in the United States of America on July 1, 1988, and was ratified between the United States of America and the United Kingdom (which includes England) on July 1, 1988.[3] The Convention was ratified between the United States and Montenegro on December 1, 1991. *See* note 3 *infra*.

7.      The objects of the Convention are as follows: (1) to secure the immediate return of children wrongfully removed or wrongfully retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States. Convention, art. 1.

---

[1]  T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10493 (1986).
[2]  22 U.S.C. 9001 *et seq*.
[3]  Hague Abduction Convention Country List, text available at: https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last accessed January 22, 2024).

## II.    JURISDICTION

8.    This Court has jurisdiction under ICARA § 9003 because this case involves the retention of two children under the age of 16 in the United States from their habitual residence of England, or in the alternative, Montenegro. The children are currently located within the jurisdiction of this Court in the Western District of Virginia.

9.    Congress has specifically granted concurrent original jurisdiction to the federal courts of actions arising under the Hague Convention. ICARA § 9003. State court custody actions may not trump clearly granted federal court jurisdiction to decide actions arising under the Hague Convention.

## III.    FACTS

10.    The Mother was born and raised in England. She has lived in Hertfordshire, England with her parents for nearly her entire life.

11.    The Mother attended and graduated from the University of Birmingham and Brunel University in Hertfordshire. She lived at home with her parents throughout her time attending university (except during term time when she attended university away from home) and after her graduation.

12.    The Mother and Father first met in 2007 when the Mother was aged 22 and the Father was aged 31. When they met, the Mother was visiting the United States from England with her then-boyfriend Bustami Pollard, who was a friend of the Father. The Father, Mr. Pollard, and the Mother were members of Subud, which is a non-

denominational association of people who "experience a direct contact between themselves and the Great Life Force, or the power of God."[4]

13.    The Father invited Mr. Pollard and the Mother to spend the day at his farm in Virginia during their trip.

14.    The Mother and Father did not see each other again until approximately 2009, when the Father travelled to England to visit friends at a Subud house in Loudwater, England. The Mother was a volunteer at the Loudwater Subud house.  During the Father's visit at the Loudwater Subud house, the Mother had lunch with the Father at a local English pub. The Father returned to Virginia a week later. The Mother and Father remained in contact with each other by email after the Father returned to Virginia.

15.    In October 2010, the Mother travelled to Virginia to visit the Father at his farm near Front Royal, Virginia. The parties then travelled to San Francisco where the Father asked the Mother to marry him, three days after the Mother had arrived in Virginia.

16.    The Mother then returned home to England, where she continued to live until the parties' wedding in January 2012. Between October 2010 and January 2012, the Mother and Father visited each other at their respective homes.

17.    The Mother and Father were married in Las Vegas, Nevada on January 9, 2012.

18.    After their wedding, the Mother moved to the Father's home located at 28 Gooney Manor Loop, Bentonville, Virginia.

---

[4] https://subudusa.org/

DocuSign Envelope ID: 748F8732C4C4B87004C0A756217882

19.     After the Mother moved to live at the Father's house in Virginia, she continued to work remotely for Subud and for the International Child Development Program (ICDP)—both of which are UK-based charity organizations.

20.     Throughout the parties' marriage until they separated on or about June 1, 2022, the Mother spent time living both in the United States with the Father, and also living in England at her parents' home in a separate apartment within the home.

21.     In June 2013, the Mother became pregnant with the parties' first daughter, A-LC.  The parties agreed that the child would be born in England.

22.     The Mother travelled to England in or about November 2014 to prepare for the child's birth. A-LC was born at the Watford General Hospital in Hertfordshire, England in March 2014. The Father remained in Virginia and travelled to England at Christmas to visit and then again in March 2014 right before A-LC's birth.

23.     After A-LC's birth, the Mother and A-LC stayed in England for six weeks at the apartment in the Mother's parents' home to recuperate; the Father returned to Virginia two days after the birth of A-LC.

24.     Thereafter, the family continued to spend time both at the Father's house in Virginia, and at the Mother's parents' house in England.

25.     After A-LC's birth, the parties agreed that the Mother would be a homemaker for the family and would not work outside the home. The Father provided financial support for the family.

26.     In November 2016, the Mother became pregnant with the parties' younger daughter, MKC. The parties agreed that the child would be born in England.

DocuSign Envelope ID: 7458F8733C4C4B67AA4DA475621788

27.    The Mother and A-LC travelled to England in May 2017 in advance of the younger child's birth. They lived full-time in England at the apartment in the Mother's parents' home. The Father travelled to England from Virginia to spend time with the family.

28.    MKC was born at the Watford General Hospital in Hertfordshire, England in August 2017.

29.    After MKC's birth, the Mother and both children continued to live at the apartment in the Mother's parents' home until the COVID-19 pandemic began in March 2020. The Father travelled to England from Virginia frequently to spend time with the family.

30.    Between May 2017 and March 2020, the children attended nursery school and primary school at Berkhamsted School in Hertfordshire, England.

31.    The children are fully involved and immersed in day-to-day family life and cultural life in England.

32.    They have extended family—grandparents, aunts and uncles, and cousins—in England, and regularly spend time with their extended family in England.

33.    The children made friends in England, participated (at age-appropriate levels) in playdates, sports-related activities, music-related activities, and other cultural activities in England. The Mother and Father (when he was able to be with the family in England) were both fully involved in all such activities with each child.

34.     The children were, and still are, registered with the National Health Service ("NHS") in England and receive age-appropriate medical and dental care in England through the socialized NHS, and receive child benefit from the UK Government.

35.     In March 2020, as the COVID-19 pandemic travel restrictions were beginning to come into effect, the Mother and Father decided that the Mother and children would travel to the United States while still able to do so, so that the family could be together. At the time, the Mother and Father believed the family would be safer in Virginia during the pandemic than in England. Before the pandemic, the parties had planned for the Mother and children to remain living in England.

36.     The Mother and children travelled to Virginia in March 2020, and stayed at the Father's house until June 2020. The older child remained enrolled at Berkhamsted School in Hertfordshire, England and attended her classes remotely online.

37.     In June 2020, the Mother and children were able to return home to England. They lived at home in England, at the same apartment in the Mother's parents' home, for the summer of 2020.

38.     The Mother and children then travelled to Virginia to live with the Father in September 2020. The family lived in Virginia from September 2020 until May 2022. The children attended school in Virginia and travelled home to England on all of the school breaks and for the summers between September 2020 and May 2022, during which times the Mother and children lived at the usual apartment in the Mother's parents' home in Hertfordshire, England.

39.     In October 2021, the family moved into a new home the Father had built in Virginia on property he inherited, located at 53 Gooney Manor Loop, Browntown, Virginia. The home is solely owned by the Father.

40.     By November 2021, the parties' relationship had irretrievably broken down because throughout the course of the parties' marriage the Father had engaged in physical abuse, psychological abuse, and coercive control over the Mother.

41.     Many of the Father's episodes of abuse occurred in the presence of the children. The Mother would frequently leave the home to seek refuge with a friend or neighbor to protect the children from witnessing the Father's abuse against her.

42.     In November 2021, the Mother told the Father that she needed to separate from him and to end their marriage. Because she was entirely financially dependent on the Father, the Mother could not leave immediately with the children. The Mother also was concerned about not unduly disrupting the children's school year.

43.     The Mother therefore continued to live at the 53 Gooney Manor Loop home, in a separate living area in the basement, from January 2022 until the children finished their school year in May 2022. The Mother locked the basement doors at night. The Father promised to make her life hell at this point. She became increasingly scared of the Father. The Mother travelled home to England whenever possible during this timeframe to prepare for her and the children's return home at the end of the 2021-2022 school year.

44.     In April 2022, the Mother sought help from the Phoenix Project, a women's shelter in Front Royal, Virginia. The Mother was not able to pursue help from the Phoenix Center after her initial attempt, because the Father discovered that the Mother had been in

contact with the Phoenix Center. He discovered the Mother had sought help when he dumped out the contents of the Mother's purse on the kitchen counter in front of the children and found written materials from the Phoenix Center.

45.     In May 2022, the Father unilaterally cut off the Mother's access to the family's bank and credit card accounts. The Mother did not work outside the home and had no access to any money. The Mother and children became dependent on the Mother's parents for financial support.

46.     On June 1, 2022, the Mother and children left Virginia with the Father's full knowledge and consent to return home to live in England at the usual apartment in the Mother's parents' home. The Father had demanded that they leave. He was concerned that the Mother would get the home in any divorce. On the day the Mother and children left, the Father threw their suitcases at the Mother causing her to sprain her wrist and hurt her ankle.

47.     The Mother and children travelled home to England with nearly all of their belongings. The Mother spent the three months prior to their May 2022 departure packing and donating personal belongings. The Father was aware of the steps the Mother was taking to organize the move home to England.

48.     The Father agreed for the children to return to live in England with the Mother. He took the children to the airport for their flight home and he paid for their excess luggage to be shipped home to England.

49.     In June 2022, the Mother enrolled the children in the local state school in Hertfordshire, England in the district in which the Mother's family's home was located.

The children were scheduled to start school in September 2022. The Father agreed to the children's enrolment in the local English school.

50.    At the end of June 2022, the Mother's parents had listed their family home in England for sale, which included the apartment where the Mother and children lived. The Mother's parents planned to purchase a new home in England when the listed home had sold. The Mother's parents did not receive any offers to purchase their listed home for an extended period of time and for longer than they had originally expected.

51.    There was therefore going to be an anticipated transition period in which the family would not have family housing in England.

52.    In addition to purchasing a new home in England (which was not immediately ready for move-in) the Mother's parents purchased a second home in Tivat, Montenegro.

53.    The Mother kept the Father fully informed of the home developments and the potential impacts on the living situation for the Mother and children. The Mother researched housing and schooling options for the children in England for the transition period.

54.    In July 2022, the Mother told the Father that she planned to file for divorce in England.

55.    That same month, the Father began voluntarily paying child support to the Mother in the amount of $2,000.00 per month.

56.     The Father sold the Mother's car in the United States and sent the Mother the sales proceeds for her to use to buy a car in England. The mother purchased a car in England with the proceeds.

57.     The Father travelled to England to visit the children from August 24, 2022 until September 1, 2022. He took the children on a vacation to Paris, France during his visit, and returned the children home to England at the end of the Paris vacation.

58.     By the end of the children's vacation with the Father, the Mother still did not yet have a new home in England. The former home was still listed for sale.

59.     In September 2022, the Mother and children therefore moved temporarily to the Mother's parents' new home in Montenegro while the Mother's parents were in transition between homes in England.  The Mother's parents anticipated that the new home in England would be ready at some point after the children's 2022-2023 school year would have already started. The Mother therefore enrolled the children in the International British School in Montenegro, so that the children would be able to be educated in the English curriculum as planned, and would be able to transition seamlessly back into the English education system after the family's temporary stay in Montenegro.

60.     The Mother kept the Father fully informed of all of the temporary living arrangements for the children in Montenegro and of the children's school enrollment during the temporary period in Montenegro.

61.     The Mother's parents' home in England had still not sold by the time of the children's October-November 2022 half-term break from school.

DocuSign Envelope ID: 7458F372-EC4C-4E97-AAEC-78T5637728B2

62.     By that point, the Mother did not believe it was best for the children to disrupt their school year by returning home to England and starting school there, particularly after the pandemic disruptions. The Mother and children therefore stayed in Montenegro for the children to continue their education at the International British School.

63.     The Mother and children returned home to England for the school breaks. They were home in England for the 2022 fall half-term break from October 27, 2022 through November 5, 2022. They were at home in England for the Christmas holiday break from December 17, 2022 through the start of school in January 2023. The family stayed at the Mother's parents' home in England, which remained listed for sale and had not yet been sold.

64.     The Father travelled to England to visit the children over the 2022 Christmas holiday break. The children stayed with the Father at a hotel in London for a week over the holiday break. The Father then returned the children to the Mother.

65.     The Mother filed her divorce case against the Father in England on December 26, 2022 (the "English Case").

66.     The Mother emailed the Father copies of the English Case pleadings and papers on January 11, 2023. The Father was served by private process with the English Case pleadings and papers at his home in Virginia on January 22, 2023. The Father responded in the English Case and claimed, *inter alia*, that he never received the papers, despite the process server having served the Father at his home.

67.     On or about February 17, 2023, the Father filed a Complaint against the Mother in the Circuit Court for Warren County, Virginia seeking, *inter alia*, divorce,

DocuSign Envelope ID: 7458B872-EC4C-4F90-AAEC-7B1063729B2

custody, child support, and equitable distribution of property (the "Warren County Case"). The Father averred in his Complaint that there were no other suits pending in Warren County or any other court with regard to custody of the children. The Father did not serve the Mother with the Warren County Case until December 2023.

68.     The children continued to attend school at the International British School in Montenegro for the rest of the 2022-2023 school year.

69.     The Mother and children returned home to England (to the Mother's parents' home which had not yet sold) for the Easter holiday from April 6-16, 2023, and then returned to their temporary home in Montenegro.

70.     The Father travelled to Montenegro to visit the children from April 27 through May 2, 2023. The children stayed with the Father in a local Airbnb for the visit. At the conclusion of the visit, he returned the children to the Mother, and he travelled alone back to Virginia.

71.     Later in May 2023, the Mother's parents accepted an offer on their now former home in England and purchased their new home in England. The Mother's parents moved into the family's new home in England on or about August 17, 2023.

72.     The Mother and Father agreed for the children to travel to Virginia to spend their summer vacation from school in July and August 2023 with the Father.

73.     The Mother and children travelled from Montenegro to New York on July 1, 2023. The Father met the Mother and children at the airport, picked up the children, and drove them to his home in Virginia. Thereafter, the Father took the children on a road trip

vacation around the United States until on or about July 31, 2023. The Father and children then spent the month of August at the Father's home in Virginia.

74. During the children's time with the Father over the summer of 2023, the Mother spent most of July 2023 in Europe, and travelled to Virginia on or about August 6, 2023 to spend time with the children. The children spent three days with the Mother at a friend's home in Virginia. The Mother then returned home to England while the children spent the rest of the month of August visiting the Father in England.

75. The Mother travelled to Virginia at the end of August to pick up the children and return them home to England. The parties celebrated the younger child's birthday at the end of August in Virginia.

76. The Mother and children then travelled home to England, where they stayed with the Mother's parents for approximately one week before travelling on to Montenegro. At that point, the Mother's parents had just recently moved into the family's new home in England.

77. The Mother had decided, and the Father had agreed, for the children to begin the 2023-2024 school year at the International British School in Montenegro. Although the original plan had been for the children to resume attending school in England for the 2023-2024 school year, the Mother could not afford the school tuition at the local private school in England at that time, and the local state schools did not have places available for both children at the same school at that time.

78.     During July and August 2023, the Father failed to pay any child support to the Mother. Beginning in September 2023, the Father unilaterally reduced the child support he had previously been paying to the Mother by 50%.

79.     The Mother ensured that the children were enrolled at their school in Montenegro to start the 2023-2024 school year. The Father paid for half of the older child's tuition at the International British School in Montenegro for the 2023-2024 school year. The Mother's parents paid for the other half of the tuition for the older child. A family friend of the Mother's parents had paid for the children's tuition at the International British School in Montenegro for the previous year.

80.     Before the Mother returned home with the children at the end of the 2023 summer break, the Father signed a consent form consenting to the children's return to Montenegro.

81.     Because the Father had substantially reduced the child support he had been paying to the Mother, the Mother obtained employment at the children's school in Montenegro as a preschool assistant to cover some of their living expenses. As a benefit of her employment, the younger child's preschool tuition was waived, and tuition was only required for the older child.

82.     In October 2023, the Mother informed the Father that she had started dating someone new, who had previously been a long-term family friend.

83.     The Mother and children travelled home to England from Montenegro for the children's 2023 fall half-term break from school. The Father also travelled to England at the same time. The children stayed with the Father in London from October 28 through

DocuSign Envelope ID: 7468B372-EC4C-4F07-AAE6-9BFD63D729B2

November 6, 2023. During the visit, the Father brought the children home to Hertfordshire on October 31, 2023 to see the Mother and to trick-or-treat with their friends. On November 4, 2023, the Mother and her extended family travelled to London to spend the afternoon with the children at the British museum.

84.    At the end of the half-term visit, the Father returned the children to the Mother, for the Mother and children to travel back to Montenegro for the children to return to school. The family met at London Stansted Airport.

85.    The Mother's new partner was with the Mother at the airport when the Father arrived with the children. The Father threatened to assault the Mother's partner, and repeatedly shouted at the Mother in front of the children calling the Mother a liar.

86.    The Mother and children were able to back away from the Father and move to the airline check-in counter to proceed with their flight to Montenegro.

87.    The Mother and children returned to Montenegro and the children resumed school.

88.    Despite the Father's behavior at the airport in November 2023, the Mother still made arrangements with the Father for the children's Christmas break from school. The parties had agreed that the children would be with the Father from December 16, 2023 until January 4, 2024. Thereafter, the children would return home with the Mother to celebrate the Orthodox Christmas holiday (the Mother's family are Eastern Orthodox Christians) with the Mother's family.

DocuSign Envelope ID: 7468B872-EC4C-4F07-AAEC-BBT163C729B2

89.     The Father sent money to the Mother for the Mother to purchase round-trip tickets for the children's travel for the Christmas break. The Mother purchased the round-trip tickets and provided copies of the tickets to the Father.

90.     The Mother flew the children from Montenegro to Washington, Dulles International Airport on December 16, 2023 as scheduled. The Father picked the children up from the Mother and drove them to his home in Virginia for the Christmas break.

91.     In the English Case pending between the parties, the English court had scheduled a hearing on the Father's jurisdictional challenge for December 18, 2023. Shortly before the hearing date, the English court rescheduled the hearing to January 11, 2024. The hearing was later rescheduled to February 9, 2024.

92.     The Mother was then served with the Father's Warren County Case on December 27, 2023.

93.     On January 3, 2024, the Father emailed the Mother informing her that he had unilaterally decided not to return the children to the Mother on January 4, 2024.

94.     The Mother travelled to Washington, Dulles International Airport on January 4, 2024 to attempt to pick up the children, in the event the Father had reconsidered his unilateral decision and come to his senses. The Father did not bring the children to the airport.

95.     Instead, the Father threatened the Mother by email that he would take the children away to Florida or to California if the Mother tried to take the children home from Virginia. He also threatened to call the police and "have the Mother jailed" if she tried to

approach his house to collect the children. The Father then cut off all communication with the Mother and between the children and the Mother.

96.    The Mother immediately called 911 when she received the Father's threatening email. The local Sheriff attended at the Father's home to perform a welfare check. But the Father had already left his house in Virginia at that time with the children.

97.    The Mother does not know where the Father went with the children, and for how long he stayed away from his home in Virginia. The Mother has now been able to re-establish audio and video contact with the children. Through her contact with the children, the Mother has been able to determine that the children are currently at the Father's home in Virginia.

98.    On January 5, 2023 the Mother promptly submitted her Hague Convention Return Application ("Hague Application") to the Central Authority for England and Wales, which transmitted the Hague Application to the United States Department of State Office of Children's Issues (the "United States Central Authority").

99.    The children were to be returned to the Mother on January 4, 2024. The Mother and children were then going to return briefly to Montenegro, pack up, and return to England on January 17, 2024. But the Father retained the children in the United States.

100.    In the alternative, the children were to be returned to their temporary home in Montenegro on January 4, 2024. There was never a scenario agreed under which the children would be retained in the United States.

## IV.    COUNT I – WRONGFUL RETENTION

101.    The Mother restates and re-alleges the allegations contained in Paragraphs 1 through 100 as if fully set forth herein.

102.    The Hague Convention applies to cases in which a child under the age of 16 years has been removed or retained from his or her habitual residence in breach of rights of custody under the law of the child's habitual residence, which the petitioner had been exercising at the time of the wrongful removal or wrongful retention of the child.

103.    The children are under the age of 16.

104.    The children's habitual residence is England, and was England on the date the Father retained the children in the United States.

105.    In the alternative, the children's habitual residence is Montenegro, and was Montenegro on the date the Father retained the children in the United States.

106.    From the totality of the circumstances perspective as of the date of retention on January 4, 2024, England was the children's home.

107.    In the alternative, from the totality of the circumstances perspective as of the date of retention on January 4, 2024, Montenegro was the children's home.

108.    England is the children's ordinary home and holds a degree of settled purpose from the children's perspective.

109.    In the alternative, Montenegro is the children's ordinary home and holds a degree of settled purpose from the children's perspective.

110.    The children are fully involved and integrated in all aspects of daily and cultural life in England. The children have extended family and friends in England. The

children receive routine medical care and dental care in England. The children receive child benefit in England. Both children participate in playdates, family activities, and cultural activities in England. England is the family's home base.

111.    The children are also fully involved and integrated in all aspects of daily and cultural life in Montenegro. The children have extended family and friends in Montenegro. The children attend school in Montenegro. Both children participate in extracurricular activities, playdates, and cultural activities in Montenegro.

112.    The parties' shared intent and agreement since at least May 2022 has always been for the children to live with the Mother in England and Montenegro, and to abandon their former home in the United States.

113.    The children have lived in England since May 31, 2022. They have lived temporarily in Montenegro since September 2022, and have always returned to the family's home base in England when not at the temporary home in Montenegro.

114.    At the time the Father retained the children in the United States from England, the Mother had (and continues to have) Hague Convention article 5*a* "rights of custody" to the children under English law by operation of law under The Children Act 1989.

115.    The Children Act 1989, Part 1, Section 2(1) provides that "[w]here a child's father and mother were married to, or civil partners of, each other at the time of his birth, they shall each have parental responsibility for the child."

116.    The parties were married at the time of the birth of each of the children. The Mother therefore has joint parental responsibility for both children under The Children Act Part 1, Section 2(1).

117.    Parental responsibility is defined in The Children Act Part 1, Section 3 as "all the rights, duties, powers responsibilities and authority which by law a parent of a child has in relation to the child and his property."

118.    The rights and responsibilities of a person entitled to parental responsibility under English law necessarily involve the "care of the child." Joint parental responsibility is a right of custody under English law and Article 5*a* of the Hague Convention.

119.    The Mother has joint parental responsibility for both children as defined by the Children Act 1989. She has this right by operation of law, and she had this right at the time the Father retained the children in the United States from England.

120.    There are no court orders entered by any court anywhere in the world changing the parties' respective *ex lege* rights of custody to the children in this case.

121.    Joint parental rights are 'rights of custody' under Article 5*a* of the Hague Convention.

122.    The Mother has these rights by operation of law without any orders having been entered relating to the children by any English court, and she had these rights at the time the Father retained the children in the United States from England.

123.    The Father's retention of the children in the United States is therefore in breach of the Mother's Hague Convention article 5*a* "rights of custody" under English law and is a wrongful retention.

124.    In the alternative, at the time the Father retained the children in the United States from Montenegro, the Mother had (and continues to have) Hague Convention article 5*a* "rights of custody" to the children under the law of Montenegro.

125.    The Family Law of Montenegro, Part 3, Rights of the Child and Relations of Parents and Children, ("Official Gazette of the Republic of Montenegro", No. 1/2007 and "Official Gazette of the Republic of Montenegro", No. 53/2016 and 76/2020) effective September 1, 2007, governs.

126.    Article 59 of the Montenegro Family Law provides that "[p]arental rights consist of the rights and duties of parents to take care of the personality, rights and interests of their children."

127.    Article 60 of the Montenegro Family Law provides that "[p]arental rights belong to the mother and father together."

128.    Article 69 of the Montenegro Family Law provides that "[p]arental care includes the responsibilities, duties and rights of the parents, for the purpose of protecting and improving the personal and property rights and well-being of the child, and includes keeping, raising, educating, representing, supporting, as well as managing and disposing of the child's property. Parents are obliged to provide parental care in the best interest of the child, in accordance with his developmental needs and capabilities.

129.    Article 70 of the Montenegro Family Law provides that "[p]arents have the right and duty to look after and raise the child by personally taking care of his life, development and health."

130.    Article 71 of the Montenegro Family Law provides that "[p]arents have the right and duty to develop a relationship with their child based on love, trust and mutual respect and to direct the child towards adopting those values that have a universal character."

131.    Article 72 of the Montenegro Family Law provides that [p]arents have the duty to provide basic education for the child, and they are obliged to take care of the child's further education according to their capabilities, taking into account the child's abilities and wishes.

132.    Article 78 of the Montenegro Family Law provides that "[o]ne parent exercises parental rights alone when [s]he alone lives with the child, and the court has not yet made a decision on the exercise of parental rights."

133.    No Montenegrin court has made any decision on the exercise of parental rights between the Petitioner and the Respondent regarding A-LC and MKC.

134.    The parties were married at the time of each child's birth and the Mother is named on the children's birth certificates. The Mother therefore has joint parental rights for the children as defined by the Montenegrin Family Law *supra*. She has this right by operation of law, and she had this right at the time the Father retained the children in the United States on January 4, 2024.

135.    The Father's retention of the children in the United States is therefore in breach of the Mother's Hague Convention article 5*a* "rights of custody" under Montenegrin law and was wrongful.

136.    The Father's retention of the children in the United States is therefore wrongful under the Hague Convention because the Father has retained the children from their habitual residence of England (or in the alternative, Montenegro), in breach of the Mother's rights of custody to the children under English law (or in the alternative, under Montenegro law), which the Mother was exercising at the time of the retention.

137.    Notice is given in this pleading that the Mother is relying upon foreign law. FED. R. CIV. P. 44.1.

138.    The Mother has requested the return of the children by submitting her Application for Return with the Central Authority for England & Wales. The Mother has never consented or acquiesced to the retention of the children in the United States.

139.    The Mother has promptly, and to the best of her ability, taken all legal steps available to her to seek the return of the children.

140.    The children are currently physically located with the Father within this Western District of Virginia at 53 Gooney Manor Loop, Browntown, Virginia 22610.

## V.    COUNT II – ARTICLE 18 RETURN

141.    The Mother restates and re-alleges the allegations contained in Paragraphs 1 through 140 as if fully set forth herein.

142.    The Mother invokes Article 18 of the Convention, which grants this Court plenary power to order the children's return at any time.

## VI.    PROVISIONAL AND EMERGENCY REMEDIES[5]

143.    The Mother restates and re-alleges the allegations contained in Paragraphs 1 through 142 as if fully set forth herein.

144.    The Mother requests that the Court issue a Show Cause Order forthwith, in light of the Father's most recent threats, ordering the appearance of the Father and the children before this Court on the first available date on the Court's calendar, and directing the Mother to arrange service of the Show Cause Order on the Father forthwith through the United States Marshals Service.

145.    Unless this Court takes expedited action to issue the initial order requested by the Mother, irreparable harm will occur to the well-being of the children in that they will continue to be deprived of their Mother and their home and schooling, and they are at risk of being removed from the Commonwealth of Virginia by the Father, based upon his most recent threats and previous removal and concealment of the children from the Mother.

146.    The Hague Convention sets forth expedited action and sets a six-week aspirational goal for final determination of this case.

147.    Pursuant to ICARA § 9004, in a proceeding for the return of a child, "[n]o court exercising jurisdiction . . . may . . . order a child removed from a person having physical control of the child unless the applicable requirements of State law are satisfied." ICARA § 9004.  In this case, the law referred to is that of the Commonwealth of Virginia.

---

[5]    This Court "[i]n furtherance of the objectives of . . . the Convention . . . may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the further removal or concealment before the final disposition of the petition."  ICARA § 9004.

DocuSign Envelope ID: 7468B372-EC4C-4F00-AAEC-8B1963172BB2

148.    In the Commonwealth of Virginia, the Uniform Child Custody Jurisdiction and Enforcement Act (hereinafter "UCCJEA") is the source for statutory law governing, *inter alia*, the resolution of both domestic and international child custody disputes and is codified as Va. Code § 20-146.1 *et seq.*

149.    Virginia law addresses the appearance of the parties and the child in Section 20-146.32(A), (C) of the UCCJEA. That section authorizes this Court to order the appearance of the child and custodian or custodians together and authorizes the court to "enter any orders necessary to ensure the safety of the child . . ." *Id.*

150.    This Court therefore has the authority to issue its show cause order, ordering the appearance of the Father and the children in that the provisions of 22 U.S.C. § 9004 have been met.

151.    This Court "[i]n furtherance of the objectives of . . . the Convention . . . may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the further removal or concealment before the final disposition of the petition." ICARA § 9004.

152.    The Father has threatened to remove the children from the Commonwealth of Virginia and to conceal their whereabouts from the Mother. He has also previously cut off all contact between the Mother and the children. It is therefore appropriate that the children's passports and travel documents are collected by the Court or by the United States Marshals Service to ensure the children are not removed or concealed. The children should have regular remote contact and when possible in-person contact with the Mother during the pendency of this proceeding. Such contact will also prevent the further removal and

concealment of the children. This Court has the authority under the Hague Convention and ICARA to enter orders requiring the Father to surrender the children's passports and travel documents to the Court or United States Marshals Service, and requiring the Father to facilitate daily remote video or other electronic contact between the children and the Mother during the pendency of these proceedings. The Court should enter such an order under ICARA § 9004.

## VII.    UCCJEA DECLARATION

153.    The details regarding the children that are required to be provided under the UCCJEA are as follows:

A.    The children have been lived at the following addresses for the five years immediately prior to the filing of this Petition:

1.    19 Mill Gardens, Tring, HP23 5ES, Hertfordshire, England and Suntime, Bigova B.B, 85318 Montenegro from August 2023 through January 4, 2024; and

2.    46 Mildred Avenue, Watford, WD18 7DZ, Hertfordshire, England and Suntime, Bigova B.B, 85318, Montenegro from September 2022 through August 2023; and

3.    46 Mildred Avenue, Watford, WD18 7DZ, Hertfordshire, England from May 2022-September 2022; and

4.    53 Gooney Manor Loop, Browntown, VA 22610, USA and 46 Mildred Avenue, Watford, WD18 7DZ, Hertfordshire, England from October 2021 through May 2022; and

5.      28 Gooney Manor Loop, Browntown, VA, 22610, USA and 46 Mildred Avenue Watford, WD18 7DZ, Hertfordshire, England from March 2020 through October 2021; and

6.      46 Mildred Avenue, Watford, WD18 7DZ, Hertfordshire, England from May 2017 through March 2020.

B.      The Mother does not have information of any custody proceeding concerning the children pending in any other court of this or any other State, except as set forth in this Petition.

C.      The Mother does not know of any person, or institution, not a party to the proceedings, which has physical custody of the children or claims to have rights of parental responsibility or legal custody or physical custody of, or visitation or parenting time with the children.

## VIII.  NOTICE OF HEARING

154.    Pursuant to ICARA § 9003(c), the Father will be given notice of any hearings in accordance with Virginia's UCCJEA.[6]

## IX.    ATTORNEYS' FEES AND COSTS PURSUANT TO CONVENTION ARTICLE 26 AND ICARA § 9007

155.    The Mother has incurred, and will continue to incur, reasonable and necessary attorneys' fees, expenses and costs as a result of the Father's wrongful retention of the children.

---

[6] The Convention itself does not specify any specific notice requirements. ICARA provides that notice be given in accordance with the applicable law governing notice in interstate child custody proceedings. ICARA § 9003(c).

156.    The Mother respectfully requests that this Court award her all of her reasonable and necessary expenses and costs incurred in accordance with ICARA § 9007, upon the filing of a separate motion for reasonable and necessary expenses and costs in accordance with ICARA, the Federal Rules, and this Court's Local Rules.

**WHEREFORE**, the Petitioner, Tatiana Lisa Compton, respectfully requests the following relief:

A.    That this Verified Petition for Return be granted;

B.    That this Court issue a Return Order directing the prompt return of the children to England;

C.    That this Court issue a Show Cause Order forthwith in the form submitted by undersigned counsel directing the United States Marshal to serve the Respondent with this Court's Show Cause Order and all other pleadings and papers filed in this case;

D.    That the Court's Show Cause Order set an expedited initial show cause and scheduling hearing for the Petitioner's counsel and the Respondent to appear on the first available date on the Court's calendar to schedule the evidentiary hearing and all other filing and case deadlines;

E.    That the Court's Show Cause Order include provisions: i) prohibiting the removal of the children from the jurisdiction of this Court during the pendency of the proceedings in this Court; and ii) ordering that the Respondent forthwith deliver all of the children's passport and other travel documents to the United States Marshal immediately upon service on the Father; and

F.    That this Court order daily electronic video and telephone access for the Petitioner with the children during the pendency of these proceedings;

G.    That this Court order in-person contact for the Petitioner with the children if the Petitioner is able to travel to Virginia during the pendency of these proceedings; and

H.    That if the Respondent removes the children or causes the children to be removed from the jurisdiction of this Court, that this Court issue an Order directing that the name of the children be entered into the national police computer system (N.C.I.C.) missing persons section and that an arrest warrant be issued for the Respondent;

I.    That this Court issue an Order directing the Respondent to pay the Petitioner's reasonable and necessary expenses, including but not limited to attorneys' fees, suit money, expenses, and costs; and

J.    That this Court grant any such further relief as justice and the Petitioner's cause may require.

## VERIFICATION

PURSUANT TO 28 U.S.C.A. §1746, I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON JANUARY 22, 2024:

*Tatiana Lisa Compton*
E250B4BA46E64FF...

Tatiana Lisa Compton
*Petitioner*

/s/ Kelly A. Powers
Kelly A. Powers
VSB No. 84714
Miles & Stockbridge P.C.
1201 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20004
(202) 465-8375

(410) 773-9102 (fax)
kpowers@milesstockbridge.com

Stephen J. Cullen, *pro hac vice pending*
Miles & Stockbridge P.C.
1201 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20004
(202) 465-8374
(410) 385-3709 (fax)
scullen@milesstockbridge.com

James A. Sullivan, Jr., *pro hac vice pending*
Miles & Stockbridge P.C.
11 N. Washington Street
Suite 700
Rockville, Maryland 20850
(301) 517-4824
(301) 841-7984 (fax)
jsulliva@milesstockbridge.com

*Attorneys for Petitioner*